Justice EAKIN joins this Dissenting Statement.

COMMONWEALTH of Pennsylvania, Petitioner

v.

Robert MAZZETTI, Respondent.

Supreme Court of Pennsylvania.

May 5, 2011.

### ORDER

PER CURIAM.

**AND NOW,** this 5th day of May 2011, the Petition for Allowance of Appeal is **GRANTED.** The issue, as stated by petitioner, is:

Did the Superior Court properly conclude that the Commonwealth is precluded from seeking application of the

school zone mandatory minimum upon violation of a sentence of probation?

COMMONWEALTH of Pennsylvania, Appellee

v.

Charles BROWN, Appellant.

Superior Court of Pennsylvania.

Submitted Jan. 18, 2011.
Filed March 9, 2011.

Alan R. Patterson, Pittsburgh, for appellant.

Michael W. Streily, Deputy District Attorney, Karen Edwards, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

BEFORE: BOWES, LAZARUS, and COLVILLE *, JJ.

OPINION BY BOWES, J.:

Charles Brown appeals from the September 8, 2008 order denying him PCRA relief. We affirm.

* Retired Senior Judge assigned to the Superior Court.

On April 21, 2000, Appellant was charged with two counts of attempted murder and one count each of aggravated assault, burglary, reckless endangerment, robbery of a motor vehicle, carrying an unlicensed firearm, and criminal mischief. On April 20, 2000, Appellant broke into the Pittsburgh, Pennsylvania apartment of his former girlfriend, Lisa B., who was not present, and destroyed various items therein. A resident of the apartment building followed Appellant, noticed that Appellant was armed, and telephoned police. Pittsburgh Police Officer Chris Wydra was dispatched to the building and *en route,* he encountered Appellant, who shot Officer Wydra in his side and stole his police vehicle. Officer Wydra was transported to a nearby hospital in critical condition.

On April 23, 2001, Appellant proceeded to a non-jury trial, where the charges relating to the attempted murder of Lisa B. as well as the burglary and vandalism of Lisa B.'s home were withdrawn. After conducting a jury-trial-waiver colloquy, the court proceeded to hear the following evidence by means of stipulation. At approximately 5:45 p.m. on April 20, 2000, Pittsburgh Police Officers Bill Gorman and Chris Wydra were separately dispatched to an apartment building on Dawson Street in Pittsburgh based on a report that an armed intruder was on the premises. Officer Gorman arrived first and encountered Robert T., who informed him that Appellant broke into Lisa B.'s apartment and fled the area armed with two handguns. Officer Gorman broadcast a description of the perpetrator and began to patrol the area.

As Officer Wydra was approaching the apartment building, he caught sight of Appellant, who was in the parking lot of Schenley Park Animal Hospital walking

toward the Boulevard of the Allies. Appellant matched the description of the suspect and signaled to Officer Wydra, who stopped his cruiser on Juliet Street and broadcast his whereabouts. Appellant started to approach Officer Wydra and then stopped and fumbled with an object in his waistband. Officer Wydra yelled at Appellant to display his hands when Appellant pulled a revolver from his waist, pointed it at Officer Wydra, and emptied his gun. Officer Wydra was struck three times, twice in the bulletproof vest and once in his side.

Officer Wydra retrieved his own weapon and returned three rounds before his gun malfunctioned. Appellant sat down in the parking lot and started to fumble in his waistband a second time. Believing that Appellant was retrieving another gun and unable to use his own, Officer Wydra retreated behind a parked car and reloaded a new magazine into his firearm. Appellant approached Officer Wydra and then stopped when the officer pointed his gun at him. Appellant entered the police cruiser and started to drive toward Officer Wydra, who fired additional rounds at the vehicle. Appellant veered away from Officer Wydra as the cruiser was struck with bullets, and he crashed into a parked vehicle. Since Appellant was no longer threatening to strike him with the police vehicle, Officer Wydra ceased firing and radioed for assistance. He was transported to a local hospital, where he remained overnight.

Other police officers arrived on the scene and initiated a search for Appellant, who had fled on foot after the crash. They discovered Appellant concealed under debris in the shed of a nearby residence. In compliance with the officers' directive to come out and raise his hands, Appellant displayed his hands, which were bloodied, but said that he was unable to leave the shed because he had been shot. Appellant

was removed and arrested. Appellant "spontaneously stated he shot at that cop because he wanted to die and I wish he would have shot me." N.T. Trial, 4/23/01, at 24. Medical personnel were summoned to attend to Appellant, and he was transported to the hospital. Police recovered a .38 caliber gun at the scene but did not locate a second firearm.

The following day, Allegheny County Detective Chris Kerns went to the hospital to interview Appellant. Appellant was administered his *Miranda* warnings and asked about a missing .32 caliber weapon. Appellant responded, "[D]on't you think if I had two guns I would have shot myself. There wasn't any .32." *Id.* at 24–25. Appellant was informed that Officer Wydra was going to survive his wound, and he responded, "I wish he would have given me a head shot. The m—— f—— ain't going to pull up on me, I ain't stupid." *Id.* at 25. When asked why he shot at Officer Wydra, Appellant responded that the officer had displayed his gun.

Lisa B. dated Appellant for approximately one year prior to the incident, but they terminated their relationship shortly before April 20, 2000. Appellant owned a .38 caliber handgun and a .32 caliber handgun, and Lisa B. found five rounds of .32 caliber ammunition and four rounds of .38 caliber ammunition in her apartment after the April 20, 2000 criminal episode and relinquished those items to police. Following their break-up, Appellant unsuccessfully attempted to reconcile with Lisa B., and when she refused, he threatened to kill her. Additionally, in the past, Appellant had told Lisa B. "that if she broke up with him, he would kill her then kill himself. He also made reference to wanting to go out in a gun fight with a cop. He stressed that to mean that he wanted to die in a gun fight with a cop." *Id.* at 26. Lisa B. did not believe that Appellant

would have carried through with his threats to kill her.

Appellant vandalized Lisa B.'s apartment on April 17, 2000, and April 18, 2000, and she began to stay with a relative. Lisa B. had spoken with Appellant following the shooting, and he acknowledged that what he did was wrong but also believed that police had acted improperly. Specifically, Appellant told Lisa B. that Officer Wydra shot and struck Appellant as he was attempting to obtain his gun to give it to the officer and at that point, Appellant returned fire and then took the cruiser to escape being killed. *Id.* at 27.

Robert T. witnessed Appellant vandalize Lisa B.'s apartment on April 18, 2000, and also overheard him swearing and stating that he wanted to kill Lisa B. When Appellant returned to the apartment on April 20, 2000, Robert T. was afraid that he would damage the apartment again and followed him. After seeing a gun in Appellant's possession, Robert T. told him that he was going to telephone the police. Appellant replied, "I don't care. I'm going to be arrested today, I will shoot a cop." [Appellant] told [Robert T.], he had been back there two days, couldn't take it anymore, [Appellant] said he would kill himself, wasn't going to jail." *Id.* at 29. Appellant repeated that he planned to "kill a cop then kill himself." *Id.* After Appellant placed his revolver to his head, Robert T. went to his own apartment and contacted police. Appellant then called for Robert T., who told him that he had telephoned the police. Appellant responded, "I don't care, I will shot the m—— f—ing cop, I will put a hole in my own head too." *Id.* at 30. At that point, Appellant fled.

Based on this evidence, Appellant, who did not have a license to carry a firearm, was convicted of attempted murder, aggravated assault, robbery of a motor vehicle, the firearms violation, and recklessly endangering another person. On February 1, 2002, he was sentenced to twenty to forty years imprisonment for attempted murder and to a consecutive jail term of five to ten years for robbery of a motor vehicle. No penalty was imposed on the remaining counts, and the court recommended that Appellant's sentence be served in a facility that would help him with his mental health issues. On appeal, we affirmed and noted that the contentions that Appellant raised on appeal related to ineffective assistance of counsel, which had to be deferred to collateral review under *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). *Commonwealth v. Brown*, 829 A.2d 353 (Pa.Super.2003) (unpublished memorandum).

Appellant filed a request for appointed counsel for purposes of preparing a PCRA petition, which was timely under 42 Pa. C.S. § 9545. Counsel was appointed but withdrew without filing a petition. After the PCRA relief was denied, we reversed because counsel had improperly been permitted to withdraw without analyzing the questions that Appellant had sought to raise on the direct appeal. We remanded for appointment of new counsel and the preparation of a petition raising the issues. *Commonwealth v. Brown*, 897 A.2d 514 (Pa.Super.2006) (No. 256 WDA 2005) (unpublished memorandum).

New counsel was appointed; counsel filed a PCRA petition alleging that trial counsel was ineffective. The PCRA court conducted an evidentiary hearing on June 27, 2008. Appellant's trial counsel, Jack Conflenti, testified as follows. He had practiced in the area of criminal defense for twenty-five years when he started to represent Appellant and recognized that the matter was serious since a police officer was shot. Mr. Conflenti went to the scene of the crime, N.T. Hearing, 6/27/08, at 13, and also "reviewed the discovery. And the defense that [Appellant] wanted

me to proceed with." *Id.* at 7. Mr. Conflenti recalled that he personally met with Appellant at jail, and he also had discussions about the matter with members of Appellant's family. *Id.* at 12. Mr. Conflenti testified that when he spoke with Appellant, "I know he was frustrated, so I re-explained a lot of things." *Id.* Trial counsel continued that the "conversation with [Appellant] was awkward and intense. And I wasn't at all sure I was driving my point home." *Id.* Mr. Conflenti decided against placing Appellant on the stand since "in all my interviews with him, he was hesitant. His responses were vague. Measured. Inappropriate sometimes. And I just really wasn't comfortable. I didn't think he would help himself." *Id.* at 13.

Counsel's professional judgment about the case was as follows: "When I reviewed this case, frankly, I thought he had two chances, slim and none, and slimmest. There was no way to win this case, in my professional opinion." *Id.* at 12. He explained that "if you are doing a suicide by cop, you don't kill the cop, because then he can't kill you. Maybe the instances I heard about those kinds of defenses, people wave the gun or misaim the gun or even if they fire. The police officer was hit. And shooting is hard. You have to aim." *Id.* at 13. Mr. Conflenti also noted that when Officer Wydra was shot, he saved someone's life by pushing them away from Appellant's line of fire, which would have resonated favorably with a jury. Counsel recognized that Appellant should have pled guilty but Appellant refused to consider this option. *Id.* at 7. Mr. Conflenti delineated that the district attorney's office would not offer a negotiated guilty plea because Appellant shot a police officer. Appellant declined to enter a general plea of guilt. *Id.* at 15.

Mr. Conflenti discussed how to approach the case with another attorney and decided to proceed before the Honorable John A. Zottola because that judge "is smart and understands things quickly," and counsel concluded that exposing the trial court to "any lengthy cross-examination or even the witnesses, would be detrimental to [Appellant]." *Id.* at 6. He had decided to proceed to a stipulated non-jury trial on only one other occasion in his career. *Id.* Mr. Conflenti "thought that maybe if I do a stipulated nonjury, if the record is kept open, and if there is something else that surfaces, then there is an opportunity to appeal." *Id.* at 15. Furthermore, Mr. Conflenti believed that by proceeding with a stipulated non-jury trial, Appellant might receive a lighter sentence. *Id.* at 15.

Mr. Conflenti stated that he could not remember details of the conversations with Appellant, nor could he recall specifically whether he discussed with Appellant that he would be foregoing confrontation rights. Counsel nevertheless indicated three times that he would have discussed the confrontation-right issue as a matter of course. At the evidentiary hearing, Mr. Conflenti was asked by Appellant's counsel if he recalled discussing with Appellant that he "would be giving up pretty much his right to confront anything?" and the witness responded, "I don't remember at this time. But I can't imagine not doing it" and that he had to have "because we did a stipulated nonjury." *Id.* at 6. Mr. Conflenti further stated that he definitely would have given Appellant his reasons for proceeding in the manner that he did. When Appellant asked Mr. Conflenti to confirm that he did not remember discussing that Appellant would "be giving basically up all the rights to confront all the evidence," Mr. Conflenti replied, "I think I would have had to have done it. I did talk about his rights." *Id.* at 7. On cross-examination, the district attorney asked Mr. Conflenti whether it would have been his "normal course of conduct to discuss" the

stipulated non-jury trial with his client, the witness stated, "I would have had to. I would not ignore that." *Id.* at 14, 15.

Following the evidentiary hearing, the PCRA court denied relief, and this appeal followed. Appellant raises these contentions:

I. Did the PCRA court err when it denied Appellant's Petition for Post–Conviction Relief where the record demonstrates that trial counsel was ineffective for failing to challenge any of the evidence presented by the Commonwealth thereby denying Appellant of the rights guaranteed him by the Sixth and Fourteenth Amendments of the Constitution of the United States of America and Article I, sec. 9 of the Constitution of the Commonwealth of Pennsylvania?

II. Did the PCRA court err when it denied Appellant's Petition for Post–Conviction Relief where the record demonstrates that trial counsel was ineffective for failing to fully inform the Appellant of the ramifications of entering into a stipulated non-jury trial whereby there would be no challenge to any of the evidence presented by the Commonwealth thereby denying Appellant the rights guaranteed him by the Sixth Amendment of the Constitution of the United States of America and Article I, sec. 9 of the Constitution of the Commonwealth of Pennsylvania?

Appellant's brief at 4.

■ We will re-phrase these prolix averments so that they can be more readily understood. Appellant first maintains that trial counsel rendered ineffective assistance by allowing the Commonwealth to proceed to present all its evidence by stipulation and thereby relinquishing Appellant's constitutional right to confront witnesses against him. Appellant also argues

that trial counsel provided ineffective assistance when he permitted Appellant to forego his right to cross-examine without sufficiently discussing the subject with him and without the conduct of a colloquy on the matter.

■ "[A]s a general proposition, [the appellate courts] review a denial of PCRA relief to determine whether the findings of the PCRA court are supported by the record and free of legal error." *Commonwealth v. Dennis,* —— Pa. ——, 17 A.3d 297, 301 (2011). Appellant argues that when counsel allowed the Commonwealth to proceed through means of a non-jury stipulated trial, he "was placed in the position of not having the assistance of counsel for his defense," citing *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Appellant's brief at 16. Thus, we must determine, as a preliminary matter, whether *Cronic* or *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which were both decided the same day, applies. This distinction is crucial. If counsel's performance falls within the parameters of *Cronic,* the defendant automatically is entitled to relief. On the other hand, where *Cronic* is inapplicable, a defendant may obtain relief based upon ineffective assistance of counsel only if he satisfies the mandates of *Strickland.* Pursuant to *Strickland,* as discussed in more detail, *infra,* the defendant must identify a specific error, either of commission or omission, committed by counsel, establishing that counsel's action or inaction was not based upon a reasonable strategy, and prove that the error was of such magnitude that the outcome of the proceeding probably would have differed.

Hence, we must analyze the difference between a *Cronic* violation and a *Strickland* allegation of ineffective assistance of counsel. In *Cronic,* after a four and one-

half year governmental investigation, the defendant was charged with mail fraud charges. Twenty-five days prior to trial, the court appointed a real estate lawyer who was young and inexperienced in criminal matters and who had never gone to trial. After the defendant was convicted, the court of appeals granted him a new trial based upon the time afforded to the lawyer to prepare, his inexperience, the gravity of the charges, the time the government took to investigate the matter, and the complexity of possible defenses.

The United States Supreme Court reversed, because: "Under the test employed by the Court of Appeals, reversal is required even if the lawyer's actual performance was flawless. By utilizing this inferential approach, the Court of Appeals erred." *Id.* at 652–53, 104 S.Ct. 2039. The Supreme Court rejected the court of appeals' creation of a presumption of prejudice based solely upon the referenced factors and ruled that to meet his burden of proving ineffective assistance of counsel, the defendant must point to specific errors made by trial counsel that mandate a new trial under the test announced in *Strickland.* The Court continued, "While the Court of Appeals purported to apply a standard of reasonable competence, it did not indicate that there had been an actual breakdown of the adversarial process during the trial of this case. Instead it concluded that the circumstances surrounding the representation of respondent mandated an inference that counsel was unable to discharge his duties." *Id.* at 657–58, 104 S.Ct. 2039.

In rejecting this approach, the Court noted that the constitutional right to effective assistance of counsel is not recognized for "its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guar-

antee is generally not implicated." *Id.* at 658, 104 S.Ct. 2039. It then took cognizance that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* (footnote omitted). It categorized circumstances where prejudice is to be presumed: where the accused is denied an attorney or prevented from consulting one at a critical stage of trial or where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[.]" *Id.* at 659, 104 S.Ct. 2039. It held, "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt. *See Strickland v. Washington,* 466 U.S., at 693–696, 104 S.Ct., at 2067–2069." *Id.* at 659 n. 26, 104 S.Ct. 2039.

■ Our Supreme Court has observed that *Cronic*-type errors are extremely limited. *Commonwealth v. Williams,* — Pa. —, 9 A.3d 613, 619 (2010). The presumption of prejudice outlined in *Cronic* has been applied in three circumstances: "where there was an actual or constructive denial of counsel, the state interfered with counsel's assistance, or counsel had an actual conflict of interest." *Commonwealth v. Reaves,* 592 Pa. 134, 923 A.2d 1119, 1128 (2007). Additionally, "[t]he defining feature of all of these cases is that the acts or omissions of counsel were of the type that are virtually certain to undermine confidence that the defendant received a fair trial or that the outcome of the proceedings is reliable, primarily because they remove any pretension that the accused had counsel's reasonable assistance during the critical time frame." *Id.* at 1128 (quoting *Commonwealth v. Cousin,* 585 Pa. 287, 888 A.2d 710, 718 (2005)). To phrase it differ-

ently, "[C]ounsel's constitutional error [must have] caused a total failure in the relevant proceeding." *Commonwealth v. Mallory,* 596 Pa. 172, 941 A.2d 686, 701 (2008).

As our Supreme Court observed in *Commonwealth v. Reed,* 601 Pa. 257, 971 A.2d 1216, 1221 (2009), a *Cronic* default is also referred to as *"per se"* ineffectiveness or framed in terms of a presumption that counsel was ineffective:

> While the parties herein use "presumption of prejudice," "presumed prejudice," and *"per se* prejudice" in discussing the third prong of the test for a claim of ineffective assistance of counsel as set forth in *Pierce,* we conclude that, for all practical purposes, all of the terms have the same meaning. Specifically, inherent in each of the terms is the recognition by the United States Supreme Court in *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), that there are some circumstances so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. *Id.* at 660, 104 S.Ct. 2039 (on some occasions, the likelihood that counsel could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial). In the past, this Court has used the terms interchangeably in the same context.

The recognized instances of *per se* ineffectiveness entitling a defendant to automatic relief are extremely narrow. *Commonwealth v. Halley,* 582 Pa. 164, 870 A.2d 795 (2005) (counsel did not file a Pa.R.A.P. 1925(b) statement and waived all issues, thereby denying the defendant his constitutional right to direct appeal); *Commonwealth v. Liebel,* 573 Pa. 375, 825 A.2d 630 (2003) (attorney did not file a petition for allowance of appeal, as requested by the defendant, and denied his

client the right to seek discretionary review with our Supreme Court); *Commonwealth v. Lantzy,* 558 Pa. 214, 736 A.2d 564, 572 (1999) (lawyer did not file a direct appeal, despite defendants request); *see also Commonwealth v. Burton,* 973 A.2d 428 (Pa.Super.2009) (filing of an untimely 1925(b) statement); *Commonwealth v. Bennett,* 593 Pa. 382, 930 A.2d 1264 (2007) (not filing an appellate brief so defendant did not obtain direct review).

On the other hand, the types of actions or inactions that are not subject to *Cronic* are legion. *E.g. Commonwealth v. Reed,* 601 Pa. 257, 971 A.2d, 1216, 1226 (2009) ("filing of an appellate brief, deficient in some aspect or another, does not constitute a complete failure to function as a client's advocate so as to warrant a presumption of prejudice under *Cronic* "); *Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523 (2009) (presentation of inconsistent alibi evidence was not *per se* ineffectiveness); *Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786 (2008) (lead counsel did not presumptively prejudice defendant when counsel, during penalty phase argument, attacked the jury's guilty verdict and then permanently left the courtroom); *Commonwealth v. Puksar,* 597 Pa. 240, 951 A.2d 267 (2008) (failure to present mitigating evidence at death penalty phases was not *Cronic* violation as defendant was responsible for restrictions on counsel's conduct); *Commonwealth v. Mallory,* 596 Pa. 172, 941 A.2d 686 (2008) (since written jury waivers were completed, fact that there was no oral jury-trial waiver was not the type of total failure by counsel that results in finding of *per se* ineffectiveness); *Commonwealth v. Reaves,* 592 Pa. 134, 923 A.2d 1119 (2007) (narrowing ambit of reviewable issues on appeal does not constitute *per se* ineffectiveness); *Cousin, supra* (*Cronic* presumption not applicable merely because trial counsel conceded guilt of lesser crime in closing argument at non

jury trial); *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822, 834 (2005) (Superior Court erred in applying presumption of prejudice to counsel's failure to object to prosecutor's reference to defendant's right to remain silent).

Two cases inform our decision herein. In *Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966), the defendant proceeded to a stipulated non-jury trial where counsel agreed to permit a finding of guilt based upon *prima facie* evidence, which included both witnesses and introduction of a confession by the defendant's co-conspirator. The defendant argued to the Supreme Court that his convictions were invalid because they were obtained at a trial wherein he was improperly denied his right to confront witnesses. The Court agreed with that contention on the basis that the defendant did not waive his confrontation rights. It noted that there is a presumption against waiver of a constitutional right, and the record established that the defendant's waiver of his confrontation rights was not knowing or voluntary.

In *Brookhart,* after the court indicated that the procedure that would be employed was the functional equivalent to pleading guilty, the defendant asserted that he did not want to plead guilty. The defendant then stated that he was anxious to proceed to trial since he was uncomfortable in the local jail, where he had been housed for eighteen months. The court informed the defendant that he would not receive credit for time served prior to trial. The defendant then acquiesced to immediately proceeding rather than delay the matter further.

The Court ruled that on the basis of that record, wherein defendant asserted that he did not want to plead guilty and then was pressured into employing a procedure that could not be distinguished from the entry of a guilty plea, the defendant did not

intelligently and knowingly relinquish his confrontation rights. The Court also concluded that counsel could not waive defendant's rights in that respect, stating:

> Our question therefore narrows down to whether counsel has power to enter a plea which is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him. We hold that the constitutional rights of a defendant cannot be waived by his counsel under such circumstances. It is true, as stated in *Henry v. State of Mississippi,* 379 U.S. 443, 451, 85 S.Ct. 564, 569, 13 L.Ed.2d 408, that counsel may, under some conditions, where the circumstances are not exceptional, preclude the accused from asserting constitutional claims. Nothing in *Henry,* however, can possibly support a contention that counsel for defendant can override his client's desire expressed in open court to plead not guilty and enter in the name of his client another plea-whatever the label-which would shut off the defendant's constitutional right to confront and cross-examine the witnesses against him which he would have an opportunity to do under a plea of not guilty. Since we hold that petitioner neither personally waived his right nor acquiesced in his lawyer's attempted waiver, the judgment ... is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*Id.* at 7–8, 86 S.Ct. 1245 (footnote omitted).

In a more recent decision, *Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), the Supreme Court confronted a situation also analogous to the one at issue. Therein, in a capital case, defense counsel made a strategic decision to concede that the defendant was

guilty of murder and to concentrate on avoiding the death penalty. The Florida Supreme Court held that conceding guilt to murder without the defendant's express consent, regardless of the strength of the prosecution's case, constituted ineffectiveness *per se*. The Supreme Court reversed and analyzed the question of counsel's ineffectiveness under *Strickland* rather than *Cronic*. It held: "A presumption of prejudice is not in order based solely on a defendant's failure to provide express consent to a tenable strategy counsel has adequately disclosed to and discussed with the defendant." *Id.* at 180, 125 S.Ct. 551.

The relevant facts are as follows. The case against Nixon was unassailable, and the state refused to forgo an attempt to obtain the death penalty so counsel, who was experienced in capital trials, focused on presenting mitigation evidence on his client's mental stability. He concluded that by not contesting guilt, the jury would be more inclined to find counsel credible when arguing for leniency. Nixon was unresponsive when trial counsel discussed his strategy with the defendant, but he also never objected to it. At trial, due to obstreperous behavior, the defendant had to be removed, and he then informed the judge he was not interested in attending. During opening argument, counsel acknowledged that his client was guilty beyond any doubt and counsel failed to actively oppose any of the prosecution's evidence and did not present a defense.

The Florida Supreme Court concluded that the record could not sustain a finding that Nixon, since he did not respond to counsel's discussion of the strategy, explicitly consented to the procedure and that counsel's concession was the equivalent of entry of a guilty plea. It held that counsel's performance was presumptively inadequate because it was the functional equivalent of no representation and a defendant cannot enter a guilty plea absent voluntary and knowing waiver of his trial rights.

■■■ The United States Supreme Court disagreed with the Florida Supreme Court and ruled that *Cronic* did not apply. It noted,

An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy. *Strickland,* 466 U.S., at 688, 104 S.Ct. 2052. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois,* 484 U.S. 400, 417–418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval). But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Wainwright v. Sykes,* 433 U.S. 72, 93, n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

*Id.* at 187, 125 S.Ct. 551.

■■■ The *Nixon* Court acknowledged that entry of a guilty plea requires an affirmative showing, through colloquy, that the defendant is voluntarily waiving his constitutional rights that pertain to trial proceedings. *See Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). It observed that even though a guilty plea may be in the defendant's best interest tactically, since it is itself a convic-

tion, under *Brookhart v. Janis, supra,* counsel cannot unilaterally consent to the entry of such a plea on a client's behalf.

The *Nixon* Court concluded that the proceedings before it were not tantamount to a guilty plea because, despite counsel's concessions, the defendant nevertheless "retained the rights accorded a defendant in a criminal trial." *Florida v. Nixon, supra* at 188, 125 S.Ct. 551. Those rights included that the state had to present its proof, the defendant could cross-examine even if that right was not exercised, the defendant could attempt to exclude prejudicial evidence, and importantly, the defendant retained the right to appeal.

Nixon urged that *Brookhart v. Janis, supra,* applied to his situation, but the Court rejected that position because in *Brookhart,* defense counsel "had agreed to a *prima facie* bench trial at which the State would be relieved of its obligation to put on complete proof of guilt or persuade a jury of the defendant's guilt beyond a reasonable doubt." *Id.* at 188, 125 S.Ct. 551 (citation and quotation marks omitted). The *Nixon* Court stated that the proceedings were not comparable to *Brookhart* because in Nixon's case, the proceedings were not truncated, the prosecution was not relieved of its responsibility to prove its case beyond a reasonable doubt, the defendant did have the ability to confront and cross-examine witnesses, and as noted, Nixon could still appeal. Finally, the Court observed that defense counsel had explained his tactics to Nixon. Thus, it rejected the position that counsel had wholly failed to meaningfully function as Nixon's attorney.

Our review of the record establishes that the proceedings at issue herein resemble *Nixon* rather than *Brookhart.* First, there was a written colloquy wherein Appellant was informed of and relinquished his right to a jury trial. Explanation of Defendant's Right Non–Jury Trial, 4/23/01, at 1–4. At the oral colloquy, the trial court ascertained Appellant's age, ability to read and understand English, abstention from drugs or alcohol in the preceding twenty-four hours, and lack of physical or mental impairment. The court then delineated the elements of each offense and the maximum sentence that could be imposed on each one. N.T. Stipulated Non–Jury Trial, 4/23/01, at 3–7. Next, the court established that Appellant understood the written jury-trial waiver, had executed it, and was satisfied with counsel.

By proceeding to a full trial, the Commonwealth still had to prove its case beyond a reasonable doubt rather than merely a *prima facie* case, as in *Brookhart.*[1] During the course of entry of the stipulated evidence, defense counsel leveled an objection, and the court was told that Officer Wydra's bullet-proof vest had no indentations that indicated that he was shot with two bullets in the chest. *Id.* at 21.

Significantly, the stipulated evidence itself established a viable defense. Specifically, Appellant told police that he wanted to kill himself and that he fired because Officer Wydra drew his weapon first. Lisa B.'s evidence was consistent in that Appellant told Lisa B. that he was fired upon before he returned fire. Robert T.'s testimony indicated that Appellant's mental state on the night in question was unstable and his description of Appellant's bizarre behavior and statements militated against a finding that Appellant operated with a specific intent to kill, the *mens rea* necessary for attempted murder. Then, during closing argument, defense counsel specifically argued that the Commonwealth failed to establish beyond a reasonable doubt that Appellant had the specific in-

---

1. We reject Appellant's position to the contrary.

tent to kill Officer Wydra based upon the fact that the victim drew his weapon first and also the described stipulated evidence. *Id.* at 36–39.

At the PCRA evidentiary hearing, it was established that defense counsel's actions were carefully weighed and tactically reasonable. Counsel was an experienced criminal attorney who decided to proceed to a stipulated non-jury trial on only one other occasion. Counsel reviewed the material that he was given during discovery, went to the crime scene, interviewed Appellant, had discussions with Appellant's family, and consulted another attorney. Counsel actually presented the defense that Appellant wanted to level, which was that he was attempting to commit suicide by having the police officer shoot him. Counsel said that he decided to proceed to a stipulated non-jury trial because he knew the trial court to be thoughtful and intelligent, because he wanted to retain defendant's right to appeal, and because he believed that Appellant would fare better at sentencing by proceeding to a stipulated non-jury trial. Indeed, in this latter respect, Mr. Conflenti's tactical decision was identical to that of the lawyer at issue in *Nixon*, who allowed the prosecution's evidence to be introduced without challenge in order to argue more effectively against imposition of the death penalty.

The record thus refutes Appellant's assertion that "trial counsel failed to function in the capacity for which he was appointed." Appellant's brief at 11. The proceedings herein are a far cry from those at issue in *Brookhart*, where there is no indication that the lawyer advocated to any extent. They certainly were not the functional equivalent of a guilty plea. Certainly, there was no actual or constructive denial of representation by counsel sufficient to invoke *Cronic*; thus *Strickland* applies. The *Strickland* test is articulated thusly in this Commonwealth:

To obtain relief on a claim of ineffective assistance of counsel, a petitioner must rebut that presumption and demonstrate that counsel's performance was deficient, and that such performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In our Commonwealth, we have rearticulated the *Strickland* Court's performance and prejudice inquiry as a three-prong test. Specifically, a petitioner must show: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's action or inaction; and (3) counsel's error caused prejudice such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *Commonwealth v. Pierce*, 515 Pa. 153, 158–59, 527 A.2d 973, 975 (1987).

*Commonwealth v. Dennis*, —— Pa. ——, 17 A.3d 297, 300–02 (2011).

█ We now consider Appellant's specific allegations of ineffectiveness and whether he established entitlement to relief under *Strickland*. Appellant claims that "trial counsel failed to conduct any pre-trial investigation." Appellant's brief at 11. This representation is not supported by the record since counsel specifically stated at the PCRA hearing that he reviewed all the discovery material provided by the Commonwealth, went to the crime scene, interviewed Appellant, spoke with his family, and discussed the matter with another attorney.

█ Appellant next asserts that counsel failed to "locate and interview witnesses for the defense." *Id.* Trial counsel will not be deemed ineffective for failing to call a witness to testify unless the PCRA petitioner demonstrates:

(1) the witness existed; (2) the witness was available; (3) counsel knew of, or should have known of the existence of

the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony was so prejudicial to petitioner to have denied him or her a fair trial. *Commonwealth v. Clark,* 599 Pa. 204, 222, 961 A.2d 80, 90 (2008).

*Dennis, supra,* 17 A.3d at 302–03; *accord Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523, 536 (2009). In this case, Appellant has failed to: 1) name a single potential defense witness; 2) delineate the substance of anyone's proposed testimony; and 3) indicate that they were available and willing to testify. Hence, he has not established his entitlement to a new trial on this ground.

■ Appellant next avers that counsel was ineffective for neglecting to "take statements from any and all potential Commonwealth witnesses for use at trial for purposes of cross-examination." Appellant's brief at 11–12. Significantly, Appellant wholly neglects to specify how any Commonwealth witness could have been impeached. In *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220 (2006), the defendant argued that his trial counsel was ineffective for not impeaching witnesses. As in the present case, the defendant failed to delineate how the witnesses could have been effectively cross-examined. Our Supreme Court refused to consider the merits of this claim on the basis, *inter alia,* that it was boilerplate and that it therefore could not "evaluate [the defendant's] insubstantial claim, as we are left to guess what relevant and material evidence trial counsel should have uncovered and how this evidence was so easily within his grasp." *Id.* at 247. Furthermore, as noted, two of the three primary Commonwealth witnesses aided Appellant's defense. Hence, Appellant has failed to establish that he is entitled to relief based upon this allegation.

■ Appellant's position that counsel "failed to interview and prepare the Appellant for trial" is belied by the record. Appellant's brief at 12. Counsel stated that he did interview Appellant and discussed the proceedings with him. Finally, Appellant maintains that counsel did not "prepare a proper defense for the criminal charges lodged against him." Appellant's brief at 12. Again, this position is erroneous. Given the evidence, it was simply not subject to dispute that Appellant shot Officer Wydra. Counsel presented the only viable defense, which was that Appellant lacked specific intent to kill his victim. Appellant's final complaint is that counsel did not "keep Appellant informed as to the status of this case prior to trial." Appellant's brief at 12. Since we are unable to discern any impact this omission would have had on the finding of guilt, we reject it as a basis for finding ineffectiveness. As the PCRA court did not err in concluding that counsel did not render ineffective assistance under *Strickland,* we must affirm.

■ Appellant's second position is that trial counsel was ineffective because he did not adequately explain to Appellant that the effect of proceeding by stipulation was to relinquish his constitutional right to confront and cross-examine witnesses. Appellant suggests that the record confirms that he was not told that he would be forgoing his constitutional right to confront witnesses. We disagree. There was a five-year gap between the trial and the evidentiary hearing. While Mr. Conflenti could not recall specifically whether he discussed the confrontation-clause issue with Appellant, he stated 1) as a matter of course, he would have discussed that question; 2) he could not imagine that he did not discuss the constitutional issue; 3) indeed, he would have had to have reviewed the question because he remembered discussing Appellant's rights with him and

since they were proceeding by stipulated non-jury trial, he would not have overlooked that important issue. Thus, the record supports the PCRA court's determination that Mr. Conflenti did not render ineffective assistance in this respect.

■ As noted, Appellant also implies that the trial court should have conducted a colloquy to inform him that he was giving up his constitutional right to confront and cross-examine the witnesses against him. The case law establishes that a colloquy is not required in this instance. In *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), in violation of the applicable discovery rules, counsel failed to reveal his intent to present a defense witness to the prosecution. As a sanction, the trial court refused to permit the defendant to present that witness at trial. One of the questions addressed by the Supreme Court was whether a defendant could be bound, absent express consent, to his counsel's decision to violate the discovery rules and thereby relinquish the defendant's constitutional right to present exculpatory evidence.

The Court observed that "Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have— full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval." *Id.* at 417–418, 108 S.Ct. 646 (footnotes omitted). The Court rejected the position that a colloquy is mandated when a lawyer's decision results in waiver of the constitutional right to present a witness. It continued that in the absence of ineffective assistance of counsel with respect to the decision, "the client must accept the consequences of the lawyer's decision to forgo cross-examination, to decide not to put certain witnesses on the stand, or to decide not to

disclose the identity of certain witnesses in advance of trial." *Id.* at 418, 108 S.Ct. 646.

In *Gonzalez v. United States,* 553 U.S. 242, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2008), the Court analyzed whether an attorney could consent to have a federal magistrate judge rather than a district court judge preside over jury *voir dire* and selection. In answering that inquiry in the affirmative, the Court rejected the notion that the waiver of that right required an on-the-record assent by the defendant. The Court acknowledged that "[f]or certain fundamental rights, the defendant must personally make an informed waiver. *See, e.g., Johnson v. Zerbst,* 304 U.S. 458, 464–465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (right to counsel); *Brookhart v. Janis,* 384 U.S. 1, 7–8, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (right to plead not guilty)." *Id.* at 248, 128 S.Ct. 1765 (quoting *New York v. Hill,* 528 U.S. 110, 114, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000)). The Court continued that, on the other hand, there are numerous choices relating to the conduct of trial and that with respect to those choices by counsel, the defendant is bound. These later decisions include "what arguments to pursue, *see Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), what evidentiary objections to raise, *see Henry v. Mississippi,* 379 U.S. 443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), and what agreements to conclude regarding the admission of evidence, *see United States v. McGill,* 11 F.3d 223, 226–227 (C.A.1 1993). Absent a demonstration of ineffectiveness, counsel's word on such matters is the last." *Id.* at 248–49 (quoting *Hill, supra* at 115, 120 S.Ct. 659).

The *Gonzalez* Court ruled that, as a matter of practical necessity, counsel was accorded control over trial management. The Court observed that many rights, including those of constitutional magnitude,

can be fully understood only by a trained professional and that the "presentation of a criminal defense can be a mystifying process even for well-informed laypersons. This is one of the reasons for the right to counsel." *Id.* at 249, 128 S.Ct. 1765. It continued that a myriad of choices that affect the conduct of a trial depend upon both an understanding of the pertinent law and upon tactical matters involving overall trial strategy. The Court stated, "These matters can be difficult to explain to a layperson; and to require in all instances that they be approved by the client could risk compromising the efficiencies and fairness that the trial process is designed to promote." *Id.*

■■■ Thus, the United States Supreme Court has held that the decision as to whether to cross-examine a witness and what agreements to enter about admission of evidence are rights that a lawyer may relinquish on behalf of a defendant without the defendant's express consent. These matters relate to the conduct of trial and strategy, and in the absence of ineffectiveness in making the decision, which did not occur herein, the client is bound by his counsel's decision. Thus, a colloquy did not have to be held in this case. We are aware under *Brookhart v. Janis, supra,* a defendant's constitutional right to plead not guilty cannot be waived by counsel absent a defendant's express consent. However, we have carefully analyzed the trial proceedings *supra* and have concluded that Appellant did not enter what amounted to a guilty plea so that *Brookhart* is inapplicable.

Order affirmed.